866 A.2d 1076

MAUREEN A. GRASSO AND R.G. GRASSO, JR., INC., PLAINTIFFS,
v. BOROUGH OF SPRING LAKE HEIGHTS, PLANNING BOARD
OF THE BOROUGH OF SPRING LAKE HEIGHTS, BOARD OF
ADJUSTMENT OF THE BOROUGH OF SPRING LAKE
HEIGHTS, ALBERT P. RATZ, CONSTRUCTION OFFICIAL AND
ROBERT WENZEL, ZONING OFFICER, DEFENDANTS,

Superior Court of New Jersey
Law Division Monmouth County

Argued: August 28, 2003—Decided: September 5, 2003.

*Robert F. Munoz*, for plaintiffs Maureen A. Grasso and R.G. Grasso, Jr., Inc. (*Lomurro, Davison, Eastman & Munoz*, attorneys).

*Scott W. Kenneally*, for defendants Borough of Spring Lake Heights, Albert P. Ratz and Robert Wenzel (*Starkey, Kelly, Blaney, Bauer & White*, attorneys).

*George McGill*, for defendant Borough of Spring Lake Heights Planning Board (*Pringle, Quinn & Anzano*, attorneys).

R.L. REISNER, J.S.C.

On July 12, 2001, plaintiffs filed a complaint in lieu of prerogative writs. Counts III and IV challenged the Board of Adjust-

ment's denial of their request for a Section "D" height variance, *N.J.S.A.* 40:55D–70(d)(6), for a house currently under construction. In Counts I and II, plaintiffs asserted that the Borough was equitably estopped from requiring any height variance based on the Borough's previous issuance of zoning and building permits for the house under construction. The court bifurcated these issues for trial.

Based upon a review of the record of the defendant Board of Adjustment hearings of March 22, 2001 and April 26, 2001 and the resolution of May 24, 2001, the court determined in a written opinion on March 26, 2002, that this Board did not make adequate findings of fact and conclusions of law.[1] An order of remand was entered, and thereafter on May 23, 2002, defendant Board of Adjustment adopted a second resolution affirming the previous denial of plaintiffs' building height variance. That denial was affirmed by the court in a written opinion of October 2, 2002. Accordingly, the order entered on November 4, 2002 dismissed Counts III and IV with prejudice.

The issue of equitable estoppel remains for decision, and the court now makes the following findings of fact and conclusions of law pursuant to *R.* 1:7–4 for Counts III and IV.

Maureen Grasso owns property designated as Block 41, Lot 1 on the official Tax Map of the Borough of Spring Lake Heights, commonly known as 1001 Old Mill Road. At the time Mrs. Grasso purchased the subject property, there was an existing two-story farmhouse with a detached two-car garage and shed. The previous builder erected the farmhouse at an elevation of fifty-four feet above sea level. The farmhouse ranged in height from approximately thirty-two to thirty-four feet from the elevated grade. The property slopes up approximately ten feet from the street curb to the rear boundary line.

---

[1] The transcripts of those 2001 hearings were admitted into evidence in this trial.

On March 28, 2000, the Planning Board approved plaintiffs' application to subdivide this property into three lots in order to build three two-story homes. Shortly thereafter, the Planning Board Engineer notified plaintiffs in writing that the Borough would pave Old Mill Road and requested that plaintiffs install sewer, water and gas laterals to service the three newly subdivided lots. Plaintiffs complied with these requests and completed these improvements.

On August 2, 2000, Mrs. Grasso's husband, Rudolph Grasso, met with Zoning Officer Robert Wenzel and explained that he wanted to proceed with the construction of the first house on the corner of Warren Avenue and Old Mill Road. A zoning permit and a building permit were needed for this construction, even though the newly approved subdivision had not yet been perfected. The corner house was to be located on the property in such a manner that, when the subdivision was perfected, the house would comply with the subdivision approvals received in March, 2000. Defendant Wenzel testified before the Board of Adjustment that Mr. Grasso did not provide any building plans for the property, but did provide a map indicating the building front, side, and rear setbacks. Grasso did not represent the building height in his written zoning permit application. Grasso testified before the Board that he provided a copy of the plot survey to Wenzel, so that Wenzel "can figure out whether you're in conformance with the setback, the front, rear, whatever." According to plaintiff Grasso, he pointed out all other relevant details of the project, and Wenzel informed Grasso that "everything was in compliance now and when the subdivision was perfected" a building permit could be obtained. Wenzel issued a zoning permit to Grasso on August 2, 2000.

Grasso also met on August 2 with Construction Official Albert Ratz to review the application for a building permit for the first house. Ratz, after several days review, issued a building permit to Grasso on August 18, 2000 for the corner house. The building permit application, completed and signed by Grasso, represented

that the height of the proposed structure was twenty-eight feet and two and one-half inches. Based upon these zoning and building permits, plaintiffs commenced construction of the first house on the corner lot.

In January 2001, it became necessary for plaintiffs to make a minor change in their subdivision request to exclude a portion of the lots located in Wall Township. At this point, a member of the Spring Lake Heights Planning Board raised an issue regarding the height of the building, noting that the zone permitted a maximum height of thirty feet when measured from the curb. Because the height of the house on the architect's plans was twenty-nine feet, two inches from the grade, not from the curb, the home had an actual elevation of thirty eight feet from the curb. Mr. Grasso testified before the Zoning Board that he was not aware of this particular zoning requirement when he began construction on the home. When questioned why he was not aware of the height requirement, Grasso replied, "[w]hether I'm a builder or not, I don't know the ordinance of every town that we go to." Grasso also testified, at trial and before the Board, that he obtained a copy of the Borough's zoning ordinances, which he turned over to a licensed surveyor, who was also a professional planner, although Grasso did not recall whether his planner actually reviewed them in order to prepare the subdivision plat in 1999. Plaintiffs completed a substantial portion of the structure before the Borough issued a stop work order on January 26, 2001.[2]

Having received the stop work order, plaintiffs then proceeded to apply for a height variance from defendant Spring Lake Heights Board of Adjustment pursuant to *N.J.S.A.* 40:55D–70(d)(6).

_____

[2] Mr. Grasso requested to make the house weather tight and structurally sound before stopping work. The Planning Board denied this request. By way of an order to show cause, the court reversed the Planning Board's decision and permitted plaintiffs to make the structure weather tight before stopping work.

At trial, Grasso estimated costs of $10,000 to demolish the farmhouse, $3,000 for curb installation, $3,800 for asphalt, $1,000 for the survey, $51,000 to construct the new house to date and a cost of $10,000 to $15,000 to demolish the existing house and existing foundation if the permits are revoked.

The trial testimony of the witnesses, plaintiff Rudolph Grasso and defendants Robert Wenzel and Albert Ratz, did not alter or significantly amend any of the previous factual findings by either the zoning board of adjustment or the two prior opinions of this court.

Grasso credibly testified that on the evening of August 2, 2000 he met with both Wenzel and then Ratz. He presented to Wenzel the subdivision plat, the footprint survey that depicted the location of the house on the subdivision and the architectural plans of the house showing a building height of twenty-nine feet, two inches from the grade at the foot of the house, not the street curb. Grasso also testified, without contradiction, that these documents were drawn by licensed professionals after he picked up the borough's schedule of zone requirements. The subdivision plans drawn in 1999 by Robert Morris, a licensed surveyor and professional planner from Point Pleasant, indicated a conforming building height of thirty feet on the plat's zoning insert. Before completion of the final plat, Grasso purchased the entire zoning code book from the Borough for the limited purpose that the plat Morris was submitting for the subdivision met the technical requirements of the ordinance for the plat's submission to the Board. On the night of the meeting. Grasso testified that he "generally" discussed these three documents with Wenzel.

Wenzel testified at trial that he only reviewed the footprint survey, and didn't recall seeing, reviewing, or discussing the subdivision plat or the architect's plans with Grasso on August 2, 2000. The house plans were drawn by a licensed architect, L. Frizzell of Point Pleasant. Wenzel looked at the footprint survey only and satisfying himself that the coverage, setbacks and lot size met the zoning ordinance requirements, he issued the zoning

permit that night, August 2, 2000. He testified that he did not visit the site or inspect any other documents before he decided then and there to issue the zoning permit. On August 2, 2000. Wenzel had no specific knowledge of the corner lot topography. He further testified on cross-examination that in his years as the zoning officer in this Borough, he never verified the building height by any means for any application for a zoning permit. Wenzel is a former mayor of Willingboro in Burlington County and as such, sat on the Planning Board there for three years pursuant to *N.J.S.A.* 40:55D–23(a). He had no other formal training or licenses in building or land use matters. He did receive some informal training from the preceding zoning officer. When he moved to Spring Lake Heights from Willingboro, he was asked by the mayor to become the zoning officer of the Borough. He had retired from the telephone company where the mayor was a fellow employee. This testimony of Wenzel is credible and believable in all respects.

After receiving the zoning permit on the evening of August 2, 2000, Mr. Grasso went to the desk nearby and presented the subdivision plat, the architect's house plans, the survey footprint and zoning permit just issued by Wenzel to defendant Albert Ratz, the construction code official. They discussed the need for a building permit. Ratz took those documents home and intended to issue a building permit within twenty days. He issued the building permit on August 18, 2000. He did not inspect the site and had no personal knowledge of the topography of this site. He relied upon the planner's subdivision plat and architect's drawings for the building height of twenty-nine feet, two inches, which met the ordinance requirements. This testimony is credible in all respects.

At some point during the construction of the footings and foundations, Mr. Grasso testified that the uphill driveway appeared to be too steep. He orally requested that Ratz grant permission to lower the elevation of the floor of the garage and to lower the grade of the driveway from the curb up to the house.

Ratz advised that this was acceptable, and that the change should be noted on the "as-built" drawings at the end of construction. Presumably such drawings would be used to obtain a certificate of occupancy once the house was completed, sold, and ready for the purchasers.

Plaintiffs contend that they were "misled" since the zone schedule of requirements handed to Mr. Grasso at Borough Hall did not specify that the maximum building height was measured from the curb. Defendants contend that only in hindsight, if the subdivision plat, which contained the grade elevation of the topography, the footprint survey, and the architect's building plans are carefully examined, compared and interpreted would anyone deduce that plaintiffs proposed to build a house more than thirty-eight feet in height measured from the curb. Both contentions are factually correct.[3] However, it was first and foremost the duty of plaintiffs' surveyor and professional planner Morris (to whom Grasso supplied a complete copy of the zoning ordinance) to discern what precisely was proposed to be built for the subdivision and to set forth in the zoning schedule in the subdivision plat for the planning board all variances that were needed for the three houses. This Morris failed to do, and this "oversight" on his part set in motion the events that led to this lawsuit.

The essential principle of the doctrine of estoppel is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct. *Middletown Policemen's Benevolent Ass'n. v. Tp. of Middletown,* 162 *N.J.* 361, 367, 744 *A.*2d 649, 652 (2000), citing *Summer Cottagers' Ass'n of Cape May v. City of Cape May,* 19 *N.J.* 493, 503–504, 117 *A.*2d 585, 590 (1955). The application of estoppel in these types of cases require that the reviewing court strike a

---

[3] The architect's plans depict a height of 29 feet, 2 inches while Mr. Grasso's handwritten building permit application describes the "height of the structure" as 28 feet, 2½ inches.

balance between the permittee's interests and the municipality's right to act to promote a community's public welfare through proper planning and zoning ordinances. *Gruber v. Mayor and Twp. Comm. of Raritan,* 39 *N.J.* 1, 15, 186 *A.*2d 489, 496–497 (1962). Several cases hold that the reviewing court should apply the doctrine of equitable estoppel only in very "compelling circumstances." *Bonaventure Intern., v. Spring Lake,* 350 *N.J.Super.* 420, 436, 795 *A.*2d 895, 904 (App.Div.2002). Equitable estoppel may be invoked against a municipality "where interests of justice, morality and common fairness clearly dictate that course." *Gruber, supra* at 13, 186 *A.*2d at 495.

In this case, plaintiffs maintain that they reasonably relied, in good faith, upon the permits issued by Wenzel and Ratz, and that it would be a gross injustice for the court to order now the costly removal of the half-completed structure that was expensive to erect.

A zoning officer must always bear in mind that if he issues a permit, and the recipient takes substantial action in reliance thereon, the municipality may be estopped from revoking the permit. *See,* Cox, *New Jersey Zoning and Land Use Administration,* Sec. 23–5, at 472–74 (2001 Ed.). In *Jantausch v. Borough of Verona,* 41 *N.J.Super.* 89, 124 *A.*2d 14 (Law Div.1956) *aff'd,* 24 *N.J.* 326, 131 *A.*2d 881 (1957), plaintiff obtained a building permit to alter a garage to make a portion suitable for use as a beauty parlor. In *Jantausch,* the appellate court recognized an "intermediate situation" in which an administrative official "in good faith and within the ambit of his duty makes an erroneous and debatable interpretation of the ordinance and the property owner in like good faith relies thereon." *Id.* at 94, 124 *A.*2d at 17. The court there rejected plaintiff's estoppel plea because it was not clear or beyond debate that the building inspector did not issue the permit in compliance with the ordinance. The court recognized, however, that "[t]here should be some point at which the owner of property who acts in such circumstances becomes secure." *Id.* at 95, 124 *A.*2d at 17; *Compare, Hilton Acres v. Klein,* 35 *N.J.* 570, 581, 174

A.2d 465, 470 (1961) ("municipal action in the land use control field taken in direct violation of law or without legal authority is void *ab initio* and has no legal efficacy.")

The Appellate Division expanded on *Jantausch* in *Jesse A. Howland & Sons, Inc. v. Freehold*, 143 *N.J.Super.* 484, 363 *A.*2d 913 (App.Div.), *certif, denied*, 72 *N.J.* 466, 371 *A.*2d 70 (1976), the facts of which resemble those of this case. In *Howland*, the plaintiff operated a concrete plant, a prior nonconforming use, within the municipality for many years. In 1973, the municipal building inspector issued a building permit for further construction at the plant. The following year, a new building inspector issued a stop work order upon a determination that plaintiff's construction required a use variance from the board of adjustment. At the time the stop work order was issued, plaintiff had completed nearly ninety-five percent of the construction. Plaintiff subsequently applied to the board of adjustment, which denied his request for a use variance. In filing a complaint in lieu of prerogative writs, plaintiff asserted that: (1) the board of adjustment denial of the use variance was arbitrary, capricious and unreasonable and (2) the municipality was estopped from rescinding the building permit. The trial court upheld the zoning board's denial of a variance, but concurred that the municipality was estopped from rescinding the permit. The Appellate Division reversed based on the trial court's interpretation of the requirements for estoppel. The trial court stated that "in order for estoppel to arise, nothing more is required on the part of both the building inspector and the applicant for a permit other than good faith coupled with reliance and detriment on the part of the applicant." *Id.* at 489, 363 *A.*2d at 916. The Appellate Division, however, held:

[W]e ... believe that the 'intermediate situation' left undecided in *Jantausch v. Verona*, 41 *N.J.Super.* 89, 124 *A.*2d 14 (L.Div.1956), *aff'd* 24 *N.J.* 326, 131 *A.*2d 881 (1957) should not in any case be resolved exclusively on the question of whether the building permit was issued 'in good faith' by a building inspector acting 'within the ambit of [his] duty' as long as there is 'proper good faith reliance thereon' (citations omitted).

The requirement we would add (which is suggested in the rationale of *Jantausch,* by reference, albeit cautionary to *Adler v. Irvington Dept. of Parks,* 20 *N.J.Super.* 240, 89 *A.*2d 704 (App.Div.1952)) is the necessity for the appearance of an issue of construction of the zoning ordinance or statute, which, although ultimately not too debatable, yet was, when the permit was issued, sufficiently substantial to render doubtful a charge that the administrative official acted *without any reasonable basis* or that the owner proceeded without good faith, (emphasis supplied.) *Id.*

Neither the Borough nor defendants Wenzel and Ratz contest the fact that plaintiffs relied on the two permits issued by defendants, or that plaintiffs have suffered a detriment as a result of this reliance. However, based on the record below, as well as applicable case law, the court is constrained to deny plaintiffs' claim for relief based on equitable estoppel. The underlying facts of this litigation simply fail to support a finding of good faith reliance upon a debatable interpretation or construction of the applicable zoning ordinances.

During his August 2, 2000 meetings, Grasso pointed out the details of his proposal, specifically representing in the written application for a building permit that the house would have a height of twenty-eight feet, two and one-half inches. Grasso candidly admitted at trial and before the Board of Adjustment, however, that he was then under the impression that the thirty-foot height requirement was measured from the curb, not from the grade. As a professional builder, having constructed more than one hundred homes throughout the state, Grasso was familiar with the practice of reviewing applicable zoning ordinances before commencing construction. It is, therefore, reasonable to conclude that Grasso should have known of the height requirement, and that his omission by not reviewing the Spring Lake Heights zoning ordinance renders it difficult to support a finding of "good faith" reliance. More importantly, it was the duty of his planner, Robert H. Morris, to review the ordinance and note in the subdivision plat prepared for the planning board that a height variance was needed for each of the three houses. A review of that plan demonstrates only lot frontage and lot depth variances were requested for the other two lots in the subdivision. Morris failed to request any variance for the corner house or lot. While

the court empathizes with the plaintiffs' plight,[4] the fact that plaintiffs relied to their detriment upon zoning and building permits, does not, by itself, support a finding of equitable estoppel.

The court cannot ignore the following testimony given by Mr. Grasso to the Board of Adjustment on this issue of equitable estoppel:

Q. When you bought this property, you knew it had unusual topography, did you not?

A. Yes, I did.

Q. Okay. Did you take it into consideration when you purchased it?

A. No.

Q. No? Was it part of the consideration of the price?

A. No. Because I thought the building height was from grade. That was my thought. That's all I can tell you.

Q. Based on nothing that was told to you by anyone in this town. Correct?

A. Right.

Q. No one in this town told you that. You just assumed it.

A. That's right sir.

Defendants contend that as a matter of settled law, since there is no "debatable" interpretation of the borough's ordinance requiring maximum building height of thirty feet measured from the curb in this zone, the permits which granted plaintiffs the apparent authority to construct a house thirty-eight feet high were void "ab initio." Thus, they contend that equitable estoppel cannot be applied to them. *See, Irvin v. Township of Neptune*, 305 *N.J.Super.* 652, 657–658, 702 *A.*2d 1388, 1391 (App.Div.1997) and *Township of Mahwah v. Landscaping Technologies*, 230 *N.J.Super.* 106, 111, 552 *A.*2d 1021, 1023 (App.Div.1989). This legal claim does not

---

[4] Plaintiffs are engaged in the occupation of building single family homes for profit. They chose not to proceed with three houses, but to build this corner house first for profit from this three lot subdivision. At the trial Mr. Grasso said that the intent of both he and his wife was to develop the two remaining lots, one for each of their daughters. In the application of the doctrine of equitable estoppel, this testimony is notable in that the plaintiff will not occupy this building as their personal residence. *Compare, Lehen v. Atlantic Highlands*, 252 *N.J.Super.* 392, 400, 599 *A.*2d 1283, 1287 (App.Div.1991).

take into account *Bonaventure Intern., supra,* a later case which
suggests that the application of this doctrine of equity still de-
pends upon weighing and evaluating several factors. *Id.* at 436–
437, 795 A.2d at 904–905. In *Bonaventure Intern.,* the trial court
considered several factors, including the fact that over a seven
year period the board of adjustment heard several applications
indicating the steady expansion by the owner of a non-conforming
use not permitted by ordinance. Ultimately the trial court did not
apply the doctrine of equitable estoppel, but nonetheless, the
appellate court did not indicate that the weighing of all relevant
circumstances by the trial court was error. *Id.*

The better view of the legal principles to apply in these types of
claims was suggested long ago in *Hill v. Bd. of Adjust.of Eaton-
town,* 122 *N.J.Super.* 156, 164, 299 A.2d 737, 741 (App.Div.1972).
There the court determined that rather than focus on whether the
permits were "utterly void" because they permitted construction
of a building beyond the requirements of an ordinance not capable
of judgmental or discretionary interpretation or application, courts
should focus instead on "relative hardship" or "gross inequities" to
apply "equitable estoppel" against municipal defendants. Here,
plaintiffs neglected to consult, and their professional planner
missed, the specific ordinance which requires a building of this
type in this zone not to exceed a height of thirty feet measured
from the curb. The documents in evidence indicate a building
height of either twenty-nine feet, two inches or twenty-eight feet,
two and one-half inches, but nowhere in the approved plans
submitted by plaintiffs did they or their professional expert plan-
ner inform the municipal officials that this height was being
measured from the topographical grade instead of the street curb.
It was the duty of plaintiffs' professional planner to do so. The
insistence, thereafter, by the municipal officials, upon compliance
with the unmistakable and "undebatable" ordinance height re-
quirements is not unreasonable; otherwise other professional
builders and their retained experts would utilize feigned ignorance
of the ordinance to justify zoning law departures in the absence of
a variance. *See Irvin, supra* at 660, 702 A.2d at 1392–1393; *Hill,*

*supra* at 165, 299 *A*.2d at 742. In this case, the height variance request was denied, and that denial has been judicially affirmed, unlike *Hill* where the zoning board approved the side yard setback variance.

Judge Lynch in *Hill* correctly pointed out that the difference between a side yard of four feet instead of seven feet to the next door neighbor suing to have the completed addition built by Mr. Hill taken down created "no discernable damage" to the next door neighbor, especially when the Board of Adjustment in Eatontown found that particular side yard violation was present in "many properties in the neighborhood." *Id.* at 164, 299 *A*.2d at 741.

This case is distinguishable from the factual circumstances in *Hill* which led to the imposition of "equitable estoppel," even though the photographs in evidence truly do not depict any "discernable damage" to the neighbors who appeared before the Board of Adjustment to object to the height variance. From the street, the height of the house up on the knoll of the lot cannot, by the naked eye, be viewed as thirty-eight feet as differentiated from thirty feet. In *Hill,* the defendant homeowner submitted his own written plan to the borough's building inspector that clearly showed a side yard of only four feet instead of the seven feet required by ordinance. The municipal building inspector "made a mistake" by issuing the permit, and the homeowner proceeded to spend several thousand dollars for the addition and was then confronted with an additional cost of $1,500 to remove the structure in 1970 unless "equitable estoppel" was applied against the borough to prevent rescission of the building permit. That the doctrine was applied in those circumstances is hardly surprising even though no amount of "debate" could interpret an express seven foot side yard requirement into four feet. *Id.,* at 167, 299 *A*.2d at 743 (Fritz, concurring). Equally important in *Hill,* the board of adjustment ratified subsequently this structure by granting a variance for a side yard setback of four feet.

Here, plaintiff, a professional builder and plaintiff's professional planner "made a mistake" by applying for a building height of

twenty-eight feet, two and one-half inches, when in fact, the building height as expressly defined by the ordinance was in excess of thirty-eight feet. The borough officials here relied upon plaintiff and his professional planner who mistakenly described the building height without accurately applying the borough's zoning ordinance's obvious definitions for height of residential buildings. Unlike *Hill*, here the subsequent variance was denied by the board of adjustment.

Accordingly, the doctrine of equitable estoppel does not apply in this case to enjoin the Borough from rescinding the permits issued by Wenzel and Ratz. The zoning and building permits are deemed null and void.

Counsel for the Borough will submit an order consistent with this opinion under Rule 4:42–1(b) and (c).

Finally, a review of the pleadings recites the actions of the defendant Planning Board but seeks no relief from that defendant Board. At the time of trial, it appeared that the subdivision of the three lots has not yet been fully perfected, mainly because of the filing of this suit, which would deprive that Board from acting. *See* Cox, *supra,* Sec. 33–7, at 637 *citing Orloski v. Planning Bd.,* 226 *N.J.Super.* 666, 670 n. 1, 545 *A.*2d 261, 263 n. 1 (L.Div.1988), *aff'd o.b.,* 234 *N.J.Super.* 1, 559 *A.*2d 1380 (App.Div.1989). Those issues are not connected to the height variance or equitable estoppel claims, so whatever claims exist between plaintiffs and defendant Planning Board concerning the subdivision should not be delayed by this suit any longer. Accordingly, the claims of plaintiffs against the Planning Board are remanded to the Planning Board. The court will not retain jurisdiction. Counsel for plaintiffs will submit an order of remand consistent with this opinion.